IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MALCOM M. RYIDU-X, #273-575
          Plaintiff

                              :

        v.                  :  CIVIL ACTION NO. WDQ-13-1398

DEPUTY SECRETARY J. MICHAEL    :
   STOUFFER[1]
WARDEN JOHN WOLFE            :
OFFICER JOHN DOE ONE
OFFICER JOHN DOE TWO        :
NURSE/MEDICAL TECHNICIAN JOHN
   DOE THREE                  :
CO II ALEXANDER FLEET
SGT. ROBERT JORDAN         :
HEARING OFFICER JOHN SANDSTROM
          Defendants      :

### MEMORANDUM OPINION

This case began with an earlier civil rights action filed by Maryland Division of

Correction ("DOC") prisoner Malcom Ryidu-X. On May 9, 2013, this Court granted summary

judgment to correctional Defendants in *Ryidu-x v. Stouffer, et al.,* Civil Action No. WDQ-12-423

(D. Md.), a civil rights action addressing whether Ryidu-X could be permanently denied

visitation based on disciplinary findings that he might be an escape risk. (*Id.,* ECF 34 and 35.)

In granting summary judgment, the Court noted that Ryidu-X had failed to timely oppose the

Defendants' dispositive motion. (*Id.,* ECF 34, p. 2).[2]

On May 13, 2013, the Clerk received a paper from Ryidu-x, dated May 5, 2013, alleging

that the Defendants in the previous case were willing to allow him visitation as a "smoke-screen

to justify [their] punishment of the plaintiff for his refusal to participate in and/or become a part

---

[1] The Clerk shall amend the docket to reflect the full and complete spelling of the Defendants' names, and to add
CO II Alexander Fleet as a Defendant in this case.

[2] Page numbers refer to the pagination in the electronic docket.

of the prostitution activities in which he was solicited to engage upon his arrival at the Jessup Correctional Institution on 3/10/10."

To be received as a timely opposition in Civil Action No. WDQ-12-423, the paper should have been dated on or before April 25, 2013. The untimely paper was not docketed in the closed case. Instead, the instant case was opened on May 13, 2013, the paper docketed therein, and Ryidu-X was given an opportunity to supplement it by providing the name(s) of the individuals responsible -- including the date(s) such offenses occurred -- and an indigency affidavit or civil filing fee.[3]  See Ryidu-X v. Stouffer, Civil Action No. WDQ-13-1398 (D. Md.), ECF 1 and 2.

Ryidu-X signed his supplemental paper on May 23, 2013; it was received and docketed by the Clerk as an Amended Complaint on May 30, 2013.[4]  (Id., ECF 4).  Now pending are the motion to dismiss or for summary judgment filed by Defendants Stouffer, Wolfe, Fleet, Jordan and Sandstrom (ECF No. 17)[5] and Ryidu-X's opposition.  (ECF 20).  A hearing is not needed to resolve the motion. See Local Rule 105.6. (D. Md. 2014).

## Background

Ryidu-X alleges that in March and April, 2010, at the Jessup Correctional Institution (JCI), he was "solicited by SGT Jordan" and an unidentified officer to participate in "homosexual activities" at JCI in exchange for contraband or other favors.  He further alleges that on or about April 17, 2010, he was "threatened by SGT Jordan" and an unidentified officer

---

[3] This claim was first raised in Ryidu-x's response to the Defendants' initial dispositive motion in Civil Action No. 12-423.  In a Memorandum Opinion issued February 5, 2013, this Court declined to address the new claim, but noted that Ryidu-x "may raise [the claim of retaliation for refusing sexual advances...in a separate action after meeting any administrative prerequisites." (Id., ECF 27, p. 3 n. 6).

[4] The claims were premised on alleged violation of his Eighth Amendment rights.  Ryidu-X did not request damages or injunctive relief.  (Id., ECF 1 and 4).

[5] Defendants Officer John Doe One, Officer John Doe Two, and Nurse/Medical Technician John Doe Three were never identified and served with summons.  They will be dismissed for lack of service.  On the rationale herein, had service been effected, these Defendants would be entitled to dismissal in this case.

with "formal disciplinary actions" for refusing to participate in a "homosexual prostitution ring" at that institution. He alleges that two days later another unidentified officer made the same threat about formal disciplinary charges if he made any complaint against JCI staff "in relation to the above stated homosexual prostitution ring." Then, on April 27, 2010, Ryidu-X claims he was "threatened" by CO II Fleet with "formal disciplinary actions" if he did not "keep [his] mouth shut" or "mind [his] business" about the homosexual activity.

Ryidu-X next alleges that in December 2010, an unidentified "nurse/medical technician" tried to "engage [him] in a homosexual manner" by offering some type of drug in exchange for Ryidu-X exposing his genitals and masturbating. Correctional staff are not alleged to have been involved in this incident. Ryidu-X alleges that on December 28, 2010, an unidentified officer told him he was going to receive a notice of infraction because he had submitted an Administrative Remedy Procedure request ("ARP") about the medical technician's alleged advances. Ryidu-X further claims that on January 3, 2011, Fleet and Sandstrom participated in a hearing at which he was found guilty of several rule violations "to punish [him] for [his] continued rejection of homosexual demands of prison staff" at JCI.[6]

Defendants present a different version of events. Defendant Jordan, who supervises roughly a dozen correctional officers, asserts that Ryidu-X's allegations of a "prostitution ring" are a complete fabrication, and he never had such a conversation with any prisoner. (ECF 17-6, ¶ 3).

---

[6] Stouffer, Wolfe, Jordan, Fleet and Sandstrom were named Defendants in Civil Action No. WDQ-12-423 (D. Md.), which examined whether Ryidu-X could be permanently denied visitations following his January 3, 2011 adjustment conviction for possessing escape paraphernalia. The paraphernalia – binder clips found in Ryidu-X's shoes – were found during his March 11, 2010 transfer from Western Correctional Institution ("WCI") to JCI. (*Id.,* ECF 34, Memorandum Opinion dated May 9, 2013). Although the adjustment hearing took place at JCI, the charges were brought by WCI personnel. (*Id.,* ECF 20-2, p. 9).

Defendants contend that Ryidu-X provides no factual support for his conclusionary claim that Fleet and Sandstrom retaliated against him with regard to the January 3, 2011 hearing. They also note that the disciplinary infraction that was the subject of that hearing had been written by officers at WCI. They further argue that Ryidu-X provides no factual support for his charge that a "homosexual prostitution ring" existed at JCI, and does not allege that he was ever forced to engage in homosexual activity against his will or sustained any other harm apart from being found guilty of the WCI infraction.

As noted, the infraction which was the subject of the January 3, 2011 hearing had been written by WCI correctional officers who strip searched Ryidu-X during his March 11, 2011 transfer to JCI. The officers found contraband in Ryidu-X's shoes. (ECF 17-2, Records Declaration of Rolisa Carter, p. 8). Fleet, who represented JCI at the January 3, 2011 hearing, was assigned to administrative duties that included scheduling hearings, ensuring the attendance of witnesses, and presenting documentary evidence. (ECF 17-3, Declaration of CO II Fleet, ¶ 1). Fleet attended the hearing solely as the prison representative. (*Id.,* ¶ 4). Fleet avers that Ryidu-X's allegation that he threatened to charge him with disciplinary infractions if he did not "keep [his] mouth shut" about a "homosexual prostitution ring" is a complete fabrication and that Fleet has no knowledge of a "homosexual prostitution ring" at JCI. (*Id.,* ¶ 3).

Sandstrom, employed by the Department of Public Safety and Correctional Services as a Disciplinary Hearing Officer, conducted the January 3, 2011 hearing, which took place at JCI. The notice of infraction stated that during a strip search at WCI Plaintiff was found to possess binder clips hidden in his shoes and, when asked what he was going to do with the clips, he replied, "I'm getting out of here one way or the other." (ECF 17-4, Declaration of John Sandstrom, ¶ 1. *Id.,* ¶ 4). Ryidu-X claimed that he did not possess the clips, which must have

4

been found in another's inmate's shoes and mistakenly attributed to him by staff. He also argued that the clips could not reasonably be considered escape paraphernalia, and made a motion to dismiss the infraction based on the length of time it took for him to receive a hearing. Ryidu-X called no witnesses, having waived the presence of the reporting officer that he had previously requested when the notice was served on him. (*Id.*). Sandstrom denied Ryidu-X's motion to dismiss the infraction based on regulations and because Ryidu-X could not cite any prejudice to his ability to present a defense. (*Id.,* ¶ 5). After reviewing the evidence, Sandstrom found Ryidu-X guilty of violating two prison rules, but dismissed a third charge because there was no evidence presented to show that the binder clips were stolen. (*Id.* and attached Inmate Hearing Record, p. 3). Sandstrom sentenced Ryidu-X to 90 days segregation and an indefinite loss of visits, which is mandatory for a third occurrence of certain rule violations. (*Id.,* ¶ 6). At no time before, during or after the hearing, did Ryidu-X inform Sandstrom that he believed the disciplinary infraction was given to him because he refused to engage in homosexual activities with prison staff. (*Id.,* ¶ 7).

Defendant Wolfe, JCI's Warden, avers that while at JCI, Ryidu-X filed requests for administrative remedy (ARPs) on a variety of matters, and also wrote a number of letters to him. (ECF 17-5, Declaration of Warden Wolfe, ¶ 2). During the entire time he was incarcerated at JCI, Ryidu-X never communicated any complaint directly to Wolfe involving an alleged "prostitution ring" operating in the institution. (*Id.,* ¶ 3). Wolfe indicates that had such an accusation been made directly to him, Wolfe would have reported it to the DPSCS Internal Investigative Unit ("IIU") for investigation and, if found credible, for action against anyone involved. (*Id*). Wolfe also avers that Ryidu-X did not complain to him that he was being threatened with disciplinary actions in retaliation for not participating in such activity. (*Id*).

JCI records show that Ryidu-X submitted ARP #1350-10, alleging that on December 2 and December 3, 2010 he was solicited to engage in homosexual activity and offered unspecified drugs by an unidentified medical employee of the private contractor that provides health care services to JCI inmates.  (*Id.,* ¶ 4; ECF 17-2, pp. 2-3). The ARP was received by Major Ford and sent to Sgt. Sellman, JCI's ARP Coordinator, who dismissed it for procedural reasons and advised Ryidu-X to resubmit it by December 25, 2010, and in the resubmitted ARP provide the identity of the person who allegedly solicited him. (*Id.*) To Warden Wolfe's knowledge, Plaintiff never resubmitted the ARP.  (ECF 17-5, ¶ 4).

Records also show that rather than resubmit the ARP, Ryidu-X filed an appeal with the Office of the Commissioner, which referred the ARP to IIU for investigation in May of 2011. (*Id.,* ¶ 5; ECF 17-2, p. 4).  Ryidu-X refused to be interviewed by an IIU investigator who visited him at WCI.  (ECF 17-5, ¶ 5).  Wolfe is unaware of any allegation, from any prisoner other than Plaintiff, or from staff, involving any "prostitution ring" at the institution.  (*Id.,* ¶ 6).

Detective Sergeant Chris Nickel was the primary IIU investigator assigned in 2011 to investigate Ryidu-X's claim about the medical employee.  (ECF 17-7, ¶¶ 1-2).  In July of 2013, Nickel asked Detective Sergeant Mark Forrest to interview Ryidu-X, then housed at WCI, about his allegations.  (*Id.,* ¶ 3).  Forrest visited WCI on July 18, 2013, to interview Ryidu-X about his allegation that he was solicited to engage in homosexual activities by an unidentified medical employee at JCI in December 2010.  (ECF 17-8, Declaration of Detective Sgt. Forrest, ¶ 2). Ryidu-X refused to answer any questions, make a statement, or discuss his allegations, stating that he had filed a lawsuit and that his deposition would be his "statement."  (*Id.,* ¶ 3).  Although the investigation of the allegation is technically "open," Ryidu-X's refusal to be interviewed and provide any evidence to IIU to substantiate his claim has essentially put an end to it.  (ECF 17-7,

¶ 5). Nickel, who has been assigned to IIU for a decade, has never heard any allegation of the existence of a homosexual "prostitution ring" at JCI from any prisoner or staff, with the sole exception of Ryidu-X. (*Id.,* ¶ 4). Nickel avers that there is no evidence to support the allegation. (*Id.*).

In addition to refuting the claims as unsubstantiated, the Defendants argue that the claims alleged to have occurred in March and April of 2010 - the only allegations which involve Jordan - fall outside the limitations period, and that Stouffer and Wolfe - who are not alleged to play any personal role in the claimed events and appear to be sued solely in their official capacities – are immune from suit or otherwise protected under the doctrine of *respondeat superior.* The Defendants also argue that: Ryidu-X did not attempt to resolve his claims using the available administrative remedies available to Maryland prisoners; verbal threats by correctional staff, without more, do not raise liability under 42 U.S.C. § 1983; and Ryidu-X's claims of retaliation are conclusionary and must be dismissed.

## Standard of Review

Defendants have moved to dismiss or for summary judgment, raising the statute of limitations as an affirmative defense and otherwise opposing the Complaint's allegations as administratively unexhausted and without factual support.[7]  (ECF 17).  "'The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion is an assertion by the defendant that, even if the facts that the plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6).

---

[7] The Defendants also contend that Deputy Secretary Stouffer and Warden Wolfe cannot be held liable under the doctrine of *respondeat superior,* and are entitled to qualified immunity, and that Defendant Sandstrom, a hearing officer, is entitled to quasi-judicial immunity.  These arguments need not be addressed, for reasons stated herein.

Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). This Court deems it appropriate to consider the Declarations and exhibits submitted by Defendants, as they are likely to facilitate disposition of this case.[8] Accordingly, the motion submitted on behalf of Defendants shall be treated as a motion for summary judgment.[9]

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[8] A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d Ed. 2004). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–67. For reasons apparent herein, discovery is not required to resolve this case.

[9] On December 5, 2013, Ryidu-X was notified that the Defendants' motion could be construed as a motion for summary judgment, and that Ryidu-X could respond by providing affidavits, exhibits and attachments opposing the motion. (ECF 18). This notice comports with the requirements of Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

8

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme

Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,

Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witnesses'

credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At

the same time, the court also must abide by the "affirmative obligation of the trial judge to

prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d

at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks

omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

At its core, this case is premised on Ryidu-X's allegation that correctional personnel used

threats and retaliated against him with regard to an adjustment proceeding because he would not

participate in sexual misconduct condoned and sponsored by prison staff.  In essence, Ryidu-X

presents an Eighth Amendment claim of failure to protect from sexual violence.  To prevail, he

must establish that Defendants knew of the specific risk of harm and exhibited deliberate or

callous indifference to it.  *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987).

"[G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). Prison officials cannot be found liable under the Eighth Amendment unless they know of and disregard an excessive risk to inmate health or safety; they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . must also draw the inference." *Id.* at 837; *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).

## Analysis
### Affirmative Defenses

Limitations Defense

Preliminarily, the Court examines the Defendants' affirmative defenses.[10]   The Defendants seek dismissal of claims based on events that occurred more than three years before this lawsuit. They further contend that none of Ryidu-X's claims has been administratively exhausted before the filing of this lawsuit.

Although there is no express limitations period in the Civil Rights Act, federal courts generally apply the most appropriate state statute of limitations to a claim filed under 42 U.S.C. § 1983. *See Wilson v. Garcia,* 471 U.S. 261 (1985); *Burnett v. Grattan*, 468 U.S. 42 (1984); *Cox v. Stanton*, 529 F.2d 47, 49-50 (4th Cir. 1975). Maryland's general three-year statute of limitations for civil actions is most applicable to this case. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-101. Ryidu-X's allegations about Defendant Jordan accrued more than three years

---

[10] *See* Fed. R. Civ. P. 8(c)(1) (providing that the statute of limitation is an affirmative defense); *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("[F]ailure to exhaust is an affirmative defense under the PLRA.").

10

before the May 23, 2013 signature date of the Complaint.[11] Jordan is therefore entitled to dismissal of the claims against him.

Exhaustion of Administrative Remedies

The Defendants argue that Ryidu-X has not completed ARP exhaustion for any of the claims. The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e.

As a prisoner, Ryidu-X is subject to the strict requirements of the exhaustion provisions. It is of no consequence that he is aggrieved by single occurrences, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. 2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's

---

[11] Under the "prison mail box rule," the Complaint shall be deemed filed as of the signature date, May 23, 2013. *See Houston v. Lack*, 487 U.S. 266 (1988); *United States. v. Dorsey*, 988 F.Supp. 917, 919-20 (D. Md. 1998).

grievance process); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review). Administrative remedies must, however, be available to the prisoner, and this Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id.* 478 F.3d at 1225; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008). Thus, Ryidu-X's remaining claims must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that Defendants have forfeited the right to raise non-exhaustion as a defense.[12] *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

---

[12] Maryland provides a three-step grievance process: request for administrative remedy to the Warden of the institution (commonly referred to as an ARP); an appeal of administrative dismissal to the Commissioner of Corrections; and submission of the grievance to the Inmate Grievance Office (IGO). *See Chase*, 286 F. Supp. 2d at 529. An appeal to the IGO must be filed within thirty days following an unfavorable decision from the Commissioner. *See* Md. Code Ann., Corr. Serv. Art. §10-206 and COMAR, Title 12 § 07.01.03.

Ryidu-X states that he filed an ARP alleging that unnamed medical personnel offered him illegal drugs in exchange for sex, and that he appealed the dismissal of the ARP to the Commissioner, who ignored it. He argues that he was not required to then pursue the matter with the IGO, and that it was the Commissioner's responsibility to act on his complaint by convening an IIU investigation. He further contends that his complaint concerning misconduct by medical personnel is outside the purview of the DOC grievance system because medical personnel are contractual employees subject to DOC supervision. (ECF 20-7).

JCI records show that Ryidu-X submitted ARP #1350-10, alleging that on December 2 and December 3, 2010, he was solicited to engage in homosexual activity and offered unspecified drugs by an unidentified medical employee of the private contractor that provides health care services to JCI inmates. (ECF 17-5, p. 3, ¶ 4; ECF 17-2, pp. 3-4). The ARP was received by Major Ford and sent to Sergeant Sellman, JCI's ARP Coordinator, who dismissed it for procedural reasons and advised Ryidu-X to resubmit it by December 25, 2010, and provide the name of the person who allegedly solicited the activity. *Id.* Rather than resubmit the ARP, Ryidu-X filed an appeal with the Office of the Commissioner, where it was referred to IIU for investigation in May of 2011. (ECF 17-5, p. 3, ¶ 5; ECF 17-2, p. 5). Ryidu-X refused to be interviewed by an IIU investigator who visited him at the Western Correctional Institution. (ECF 17-5, p. 3, ¶ 5).

The Court is aware that once the IIU initiates investigation, the matter no longer is subject to the ARP process. *See Bogues v. McAlpine, et al.*, Civil Action No. CCB-11-463 (D. Md.), ECF 23, Exhibit 4 at 23; *Oliver v. Harbough, et al.,* Civil Action No. ELH-11-996 (D.

13

Md.), Memorandum of December 19, 2011, ECF 31 at 7-8. Here, however, Ryidu-X refused to cooperate with the IIU investigation. This precluded internal investigation and fact-finding at the agency level. Even if Ryidu-X's conduct is not deemed abandonment of the exhaustion requirement mandated by the PLRA, his claim about the alleged misconduct occurring in December of 2010 fails, because there is no evidence to support the claim.

Ryidu-X's claim against Fleet and Sandstrom concerning the January 3, 2011 disciplinary hearing also fails. Following his conviction for misconduct that had occurred during his stay at WCI, Ryidu-X filed an IGO appeal. The ALJ limited review to the record surrounding the hearing, heard oral argument, did not consider Ryidu-X's April 15, 2011 grievance brief, and did not admit it into evidence.[13] The ALJ examined whether DOC procedures were violated, specifically, whether the nine-month delay between the issuance of the notice of infraction at WCI and the disciplinary hearing at JCI prejudiced him by preventing his participation in DOC programs and thus affected his future progress through the sentencing matrix. On August 25, 2011, the ALJ found that Ryidu-X had shown no prejudice as a result of the delay and denied the grievance. (ECF 20, pp. 18-19).

Ryidu-X's attempt to derail his disciplinary conviction by claiming retaliation based on the alleged "prostitution ring" does not constitute administrative exhaustion of these claims. No evidence supports Ryidu-X's claim that such activity exists; furthermore, Ryidu-X has failed to assist prison officials who have attempted to investigate his claim.

---

[13] Ryidu-X's brief for the first time alleges that he was placed in harm's way when reassigned to a general population segregation unit and that Fleet and Sandstrom "subjected [him] to a vindictive persecution . . . due to the filing of ARP complaint NO. JCI-1350-10 . . . [concerning] sexual harassment and homosexual solicitation by JCI staff." (ECF 20, p. 20-21).

14

For these reasons, Defendants' dispositive motion will be granted.  A separate Order shall be entered dismissing the unnamed and unserved "Doe" Defendants, granting summary judgment in favor of Defendants Stouffer, Wolfe, Fleet, Jordan and Sandstrom, and closing this case.

8/26/14
(Date)

_____
William D. Quarles, Jr.
United States District Judge

15